IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

UNITED STATES OF AMERICA,      )
                               )
            v.                 )      C.A. No.  19-cr-0021 (MN)
                               )
HENRY CHALAS-FELIX, a/ka       )
HENRY CHALAS-POTRASO, a/k/a    )
RAFAEL RUBEN TORRES-BEYLEY     )
                               )
            Defendant.         )

## **MEMORANDUM OPINION**

Alexander P. Ibrahim, Christopher L. de Barrena-Sarobe – attorneys for the United States


José Luis Ongay – attorney for Defendant


November 25, 2019
Wilmington, Delaware

**NOREIKA, U.S. DISTRICT JUDGE:**

On April 3, 2019, Defendant submitted a Motion to Suppress Evidence (D.I. 13) ("the Motion," or "Defendant's Motion"). The Government responded on April 24, 2019 (D.I. 14) and Defendant replied on May 27, 2019.[1] The Court then conducted an evidentiary hearing regarding the issues raised on July 11, 2019, after which it requested additional briefing from the parties. That briefing was submitted on August 5, 2019 and August 16, 2019 (D.I. 26-27). The Court has reviewed all of the filings and the evidence submitted as well as the arguments presented at the hearing. For the reasons set forth in this opinion, IT IS HEREBY ORDERED that Defendant's Motion to Suppress is DENIED.

## I.     FACTUAL BACKGROUND

On December 20, 2018, DEA agents and task force officers, in conjunction with local law enforcement (collectively, "Agents"), executed a coordinated operation targeting a drug trafficking organization ("DTO") operating in Delaware, Maryland, and Pennsylvania. (Tr. at 13:4 – 15:20).[2] As part of this operation, one team of Agents executed a search warrant in Chester, Pennsylvania looking for heroin and two known members of the DTO. *Id.* Concurrently, two other Agent teams of similar size attempted a pair of knock-and-talks in Wilmington, Delaware – one to speak with a third member[3] of the DTO and the other to speak with Sonia Maldonado-Burgos ("Ms. Burgos").

---

[1]    Defendant submitted its first reply on May 24, 2019 (D.I. 18), and later submitted a corrected reply on May 27, 2019 (D.I. 19).

[2]    References to "Tr." are to the transcript of the July 11, 2019 hearing, which is attached as Exhibit A to D.I. 27.

[3]    The Government has inconsistently described the involvement of the third individual associated with the DTO (the person sought in Wilmington who was not Ms. Burgos). *Compare* D.I. 14 at 2 (referring to individuals sought in Chester as "the 'Targets'" and other individual sought in Wilmington as "Third Party"), *with* D.I. 27 at 2 (referring to all three individuals as "known members of the [DTO].") Based on the testimony of Agents who were at Ms. Burgos' home, however, it is apparent that they were under the impression

*Id.*  The Agents sought to contact Ms. Burgos because information uncovered during the DEA's investigation into the DTO indicated she may have had some knowledge of or involvement in the DTO.  The cell phones of the two DTO members sought in Chester had been "pinged" [4] at or near Ms. Burgos' apartment on several occasions and two cars observed participating in the DTO's narcotics distribution were registered in her name.  (Tr. at 29:5-20; 38:21 – 39:22).

While the Agents assigned to contact Ms. Burgos were waiting to attempt to interview her, they were alerted that the two DTO members in Chester had been apprehended in possession of narcotics, but the third DTO member had not been located.  (Tr. at 42:15 – 43:3).  Shortly thereafter, around 7:30 a.m., Ms. Burgos emerged from her second-floor apartment and walked down the stairs of her building.  (Tr. at 43:4-8).  Two Agents approached her, identified themselves, and informed her that they wanted to speak with her.  (Tr. at 44:13-18).  She agreed to speak with them inside her home and began leading the two Agents back to her building.  (Tr. at 44:19-21).  They were joined by four other Agents.  (Tr. at 47:2-10).

As they walked up the stairs to her unit, one Agent asked Ms. Burgos whether anyone else was inside her home.  (Tr. at 46:10 – 47:1).  The Agents did not expect anyone else to be present, (Tr. at 40:3-7; 84:21 – 85:5), but Ms. Burgos responded in the affirmative.  (Tr. at 47:16-24; 85:1 – 86:1).  Although it is disputed whether this information was relayed before or after Ms. Burgos opened the door to her apartment, it is not disputed that every Agent was aware that an unidentified

---

that the third individual was a member of the DTO.  (*See* Tr. at 14:4 – 15:20 (referring to each individual as a "target")).  Since we must ask *infra* whether the actions of the Agents at Ms. Burgos' apartment were reasonable, the Court bases its analysis on those Agents' understanding – that the missing individual was a member of the DTO.

[4]  The DEA had "ping" warrants – warrants that allow law enforcement to monitor the location of cell phones via GPS – for the cell phones of those two persons.  (Tr. at 16:16 – 17:2; 39:1-16).

individual was inside the apartment before he crossed the threshold. (*See* Tr. at 63:1-9; 83:15 – 84:16).

Once inside, the Agents announced their presence and instructed anyone inside to show him or herself. (Tr. at 49:7-11; 78:11 – 79:8). The Agents repeated the announcement and instructions approximately six to ten times. (Tr. at 50:7–10; 78:11-14). When no one came forward, the Agents initiated a protective sweep, entering each room and searching every place a person might fit. (Tr. at 52:21 – 54:13). In the apartment's second bedroom, the sweeping Agent saw Defendant on a mattress, apparently asleep. (Tr. at 53:2 – 5). The Agent ordered Defendant to show his hands, and then entered the room to detain him. (Tr. at 55:5 – 11). While another Agent handcuffed Defendant, (Tr. at 55:9-11), the Agent who initially entered swept the bedroom because, in his experience, "[w]here there is one individual, there [are] two," (*See* Tr. at 69:25 – 70:10). During the sweep, the Agent observed crack cocaine, cash, and a digital scale in plain view on a shelf in Defendant's open closet. (Tr. at 56:14 – 58:16). The Agent did not seize the contraband at that time, but escorted Defendant out of the bedroom and into the living room. (Tr. at 58:17 – 59:24). The entirety of the sweep lasted, at most, two minutes and twenty seconds. (Tr. at 60:15 – 61:5).

As the bulk of the Agents executed the protective sweep, one interviewed Ms. Burgos. (D.I. 14 at 5). She informed him that Defendant was a tenant who rented the second bedroom (the one in which he was simultaneously being detained). (*Id.*). She also consented to a search of her apartment. (*Id.*). Pursuant to this consent and after detaining Defendant and completing the sweep, the Agents more thoroughly searched the apartment, except for Defendant's room. (*Id.*). As one of the Agents testified, the Agents did not believe they were doing anything illegal at any point during this encounter with Ms. Burgos and Defendant. (Tr. at 49:12-14; 61:6-8).

Subsequently, the Agents transported Defendant to the DEA's Wilmington office to attempt to interview him. ((Tr. at 19:25 – 20:2); (D.I. 14 at 5)). The interview commenced around 8:30 a.m. that same day and was video-recorded. (D.I. 22, Exhibit 4 at 5:48 – 5:56 (Interview Recording); D.I. 22, Exhibit 5 at 6 (Interview Transcript)). It was conducted by three Agents in a conference room that the DEA typically uses for internal team meetings and that can comfortably seat at least a dozen people. (Tr. at 21:22 – 22:12; 25:21 – 26:16). The interview was conducted in Spanish, as Defendant does not speak English fluently, and one of the Agents acted as a translator. (Tr. at 20:6–13). Defendant was not restrained, all Agents were in plainclothes, and no weapons were visible. (*See* D.I. 22, Exhibit 4). The Agents provided Defendant with a written, Spanish-language notification of his rights under *Miranda* and also read it to him. ((Tr. at 22:16 – 23:21); (D.I. 22, Exhibit 4 at 0:50 – 3:36; D.I. 22, Exhibit 5 at 2-6)). Defendant, in turn, indicated his understanding of those rights two separate times, both times with gestures (nodding) and in writing. (D.I. 22, Exhibit 4 at 3:37 – 5:33; D.I. 22, Exhibit 5 at 3-5). The Agents then asked Defendant if he would be willing to speak with them without a lawyer present. (D.I. 22, Exhibit 4 at 4:04 – 5:33; D.I. 22, Exhibit 5 at 5-6). Twice, he agreed. (D.I. 22, Exhibit 4 at 4:05 – 6:30; D.I. 22, Exhibit 5 at 5-6). In the ensuing conversation, Defendant admitted that he was not from the United States, stated he had entered the country illegally (and been deported) two years prior, and made inculpatory statements related to the physical evidence the Agents spotted in his room. (D.I. 22, Exhibit 4 at 6:32 – 9:11, 25:20 – 29:17; D.I. 22, Exhibit 5 at 6-10, 27-30). He also consented to a search of his room. (D.I. 22, Exhibit 4 at 13:08 – 25:04; D.I. 22, Exhibit 5 at 15-27). At no point did the Agents raise their voices or physically or verbally abuse Defendant; they acted courteously and professionally throughout the interview. (*See* D.I. 22, Exhibits 4-5). In total, the interview lasted approximately thirty minutes. (*Id.*).

Based on Defendant's consent, the Agents searched his room. They discovered 24 bags of crack cocaine, 130 baggies of heroin, a bag of cocaine, hundreds of clear plastic sandwich bags, and a digital scale. (D.I. 14 at 7).

## II.  DISCUSSION

Defendant's Motion seeks exclusion of "the evidence found in his bedroom" as well as "the statement" he later provided to police during his custodial interview. (D.I. 13 at 2). Defendant originally asserted five grounds for his Motion: (i) the search of his bedroom violated his Fourth Amendment rights; (ii) his and Ms. Burgos' later consents to search "were inapplicable because they were obtained after the illegal search"; (iii) Ms. Burgos lacked authority to consent to a search of his bedroom; (iv) his consent to search was involuntary; and (v) his subsequent statement during the interview was "the fruit of the illegal search." (*Id.* at 3).

The Government has responded that it "will not argue that the subsequent written consents from either Ms. Burgos or Defendant . . . could cure the prior entrance into Defendant's bedroom if the original protective sweep [was] illegal [or] that Ms. Burgos had authority to consent to a search of Defendant's bedroom." (D.I. 14 at 8). It therefore submits that grounds (ii) and (iii) are moot. (*Id.* at 8 n.2). The Court agrees. *See, e.g.*, *United Steel Paper & Forestry Rubber Mfg. Allied Indus. & Serv. Workers Int'l Union AFL-CIO-CLC v. Gov't of the Virgin Islands*, 842 F.3d 201, 208 (3d Cir. 2016) ("A case is moot when the 'issues presented are no longer live . . . .'" (quoting *Cty of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979))). The Government appears to have interpreted Defendant's argument (iv), however, to constitute not only an argument that Defendant's consent was involuntary, but also an argument that Defendant's inculpatory statements regarding the contraband found in his room were involuntary. (D.I. 14 at 7-8 ("Defendant's Motion presents several grounds for the suppression of evidence, claiming: . . . (4) the consent Defendant gave to search his bedroom and his inculpatory statements were

involuntary.")).   Based on Defendant's argument, the Court agrees with the Government's interpretation.[5]

Thus, three issues remain for the Court's consideration: (A) whether the Agents' protective sweep of Defendant's bedroom constitutes an illegal search under the Fourth Amendment that justifies suppression of the contraband discovered; (B) whether Defendant's subsequent inculpatory statements during his interview should be suppressed as involuntary or as impermissible "fruit" of the protective sweep; and (C) whether Defendant's subsequent consent to a more thorough search of his room was involuntary.   The Court considers each in turn.

### A.      The Agents' Protective Sweep Was Unlawful but Conducted in Good Faith.

Defendant asserts that the DEA's inspection of his room violated his rights under the Fourth Amendment to be protected from "unreasonable searches and seizures" and should be suppressed as "fruit" of an illegitimate search.  (D.I. 13 at 3-6).  The government has countered that, rather than a "search," the inspection constitutes a permissible "protective sweep" – a limited inspection to discover individuals posing a danger to law enforcement or others – under the "second prong" of the Supreme Court's decision in *Maryland v. Buie*, 494 U.S. 325 (1990), and, even if it does not, the Agents acted with a good faith belief that their actions were legal and, therefore, the evidence discovered should not be suppressed.  (D.I. 14 at 1, 8-12).  The Court finds (1) that the "protective sweep" violated the Fourth Amendment, but (2) that the Agents acted in good faith.

---

[5]      The Government also argues that given his immigration status, Defendant's Motion has no impact on Count III of the indictment in this case, which relates to his alleged illegal presence in the United States.  (D.I. 14 at 14-15).  Because the Court denies the Motion, it does not reach this issue.

1.      The Protective Sweep

"It is axiomatic that the 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'" *United States v. White*, 748 F.3d 507, 510-11 (3d Cir. 2014) (citing *Welsh v. Wisconsin*, 466 U.S. 740, 748 (1984) (quoting *United States v. United States Dist. Court for the E. Dist. of Mich., S. Div.*, 407 U.S. 297, 313 (1972))).  Hence, the Fourth Amendment draws a "firm" and "bright" line at the entrance to the home.  *Id.* at 511 (citing *Kyllo v. United States*, 533 U.S. 27, 40 (2001); *Payton v. New York*, 445 U.S. 573, 590 (1980)).  This protection extends not only to home-owners, but also to leaseholders, *i.e.* tenants.  *Minnesota v. Carter*, 525 U.S. 83, 96 (1998) (citing *Chapman v. United States*, 365 U.S. 610 (1961)).  Thus, "[a] search of a house without a warrant issued on probable cause is generally unreasonable." *White*, 748 F.3d at 511 (citing *Buie*, 494 U.S. at 331).  Of course, several exceptions to the warrant requirement exist, two of which were announced by the Supreme Court in *Maryland v. Buie*:

> "prong 1" [of *Buie*] permits a warrantless search of a home "incident to an arrest" occurring in the home, provided that the search is limited to those places "immediately adjoining the place of arrest from which an attack could be immediately launched." . . .  "prong 2" authorizes a warrantless search of a home based on reasonable and articulable suspicion that the areas being searched may "harbor [ ] an individual" who poses a danger to those present at the scene of the arrest.

*Id.* (quoting *Buie*, 494 U.S. at 334).  Searches under either prong – so-called "protective sweeps" – must be "narrowly confined to a cursory visual inspection of those places in which a person may be hiding." *Buie*, 484 U.S. at 327.

The question the Court must address here, however, is whether *Buie* – despite its arrest-centric language – permits protective sweeps in non-arrest settings and, more specifically, whether it permits protective sweeps when law enforcement gains entry to a home by consent.  Neither the Supreme Court nor the Third Circuit has yet opined on this issue, but all of the other federal courts

of appeal and at least one state's highest court (New Jersey's) have. Moreover, all but one of those appellate courts has upheld in-home protective sweeps in non-arrest settings, including where entry was based on consent. *See, e.g.*, *United States v. Holland*, 522 F. App'x 265, 276-77 (6th Cir. 2013) (McKeague, J., concurring) (noting that the First, Second, Fourth, Fifth, Sixth, Seventh, Eighth, and Eleventh Circuits have "concluded that a protective sweep is permissible as long as the officers were lawfully present (whether authorized by arrest warrant, exigent circumstances or consent) and had reasonable, articulable suspicion of danger"); *United States v. Garcia*, 997 F.2d 1273, 1282 (9th Cir. 1993) (citing *Buie* for proposition that "no probable cause [is] required to sweep home to secure officers' safety" even in absence of probable cause to arrest); *United States v. Patrick*, 959 F.2d 991, 996 (D.C. Cir. 1992), *abrogated on other grounds by Apprendi v. New Jersey*, 530 U.S. 466 (2000) ("Once the police were lawfully on the premises [as a result of tenant's consent], they were authorized to conduct a protective sweep based on their reasonable belief that one . . . inhabitant[] was trafficking in narcotics."); *New Jersey v. Davila*, 203 N.J. 97, 125 (N.J. 2010); *but see United States v. Davis*, 290 F.3d 1239, 1242 n.4 (10th Cir. 2002) (rejecting protective sweep argument because "[w]hen the police in this case entered [the defendant's] home no one was under arrest, and . . . there was no probable cause to arrest anyone").

The Third Circuit has asserted that no "bright line rule limit[s] protective sweeps to in-home arrests," *White*, 748 F. 3d at 512 (quoting *Sharrar v. Felsing*, 128 F.3d 810, 824 (3d Cir. 1997), *abrogated on other grounds by Curley v. Klem*, 499 F.3d 199 (3d Cir. 2007), and ruling *Buie* applicable to protective sweeps "incident to an arrest occurring just outside the home"), while the United States Supreme Court has characterized as "dubious logic" the argument that "an opinion *upholding* the constitutionality of a particular search implicitly holds unconstitutional any search that is not like it." *United States v. Knights*, 534 U.S. 112, 117 (2001); *see also Davila*,

203 N.J. at 116 (making the same argument). Rather, "[t]he touchstone of the Fourth Amendment is reasonableness," *Knights*, 534 U.S. at 118, especially when dealing with "necessarily swift action predicated upon the on-the-spot observations" of law enforcement, *Terry v. Ohio*, 392 U.S. 1, 21 (1968). And "the reasonableness of a search is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate government interests." *Knights*, 534 U.S. at 118-19 (internal citations and quotation marks omitted).

The cited appellate courts that have allowed protective sweeps subsequent to a consent entry have reasoned that although the *Buie* Court emphasized the fact of arrest in its holding, it did so only "because the arrest exposed the officers to danger" and demonstrated lawful police presence in the home. *See, e.g.*, *United States v. Gould*, 364 F.3d 578, 581 (5th Cir. 2004) (*en banc*), *abrogated on other grounds by Kentucky v. King*, 563 U.S. 452, 462-68 (2011); *Davila*, 203 N.J. at 117; *see also Buie*, 494 U.S. at 1098 n.1 ("[T]he arrest warrant gave the police every right to enter the home to search for Buie. Once inside, the potential for danger justified a standard of less than probable cause for conducting a limited protective sweep."). They point out that rather than relying on the arrest in its reasoning, the *Buie* Court relied on the long-established principles from *Michigan v. Long*, 463 U.S. 1032 (1983), and *Terry v. Ohio*, 392 U.S. 1, that law enforcement may carry out limited weapons searches for protection purposes where "specific and articulable facts" create "reasonable suspicion." *See, e.g.*, *Gould*, 364 F.3d at 581-82; *Davila*, 203 N.J. at 117; *see also Buie*, 494 U.S. at 1096-98. Moreover, *Buie* gives no indication that "circumstances other than arrest which expose police officers to a comparable degree of danger could not also justify a similar protective response (at least where those circumstances are not the product of police illegality or misconduct)" nor that the Supreme Court's decision "would have been different

had the police otherwise properly entered the house as, for example, pursuant to a proper consent rather than a warrant." *Gould*, 364 F.3d at 581; *see also Buie*, 494 U.S. 325.

On the other hand, the first panel of the Tenth Circuit to consider this issue confined *Buie* to its facts, rejecting a protective sweep argument because no one was under arrest at the time of the search. *See United States v. Davis*, 290 F.3d at 1242 n.4. Yet the Tenth Circuit panel provided little analysis for its reasoning, disposing of the issue "briskly" based solely on "the definition of 'protective sweep'" in *Buie*. *Id.* Nevertheless, that ruling has prevented later panels of the Tenth Circuit from considering arguments in favor of a more expansive reading, despite apparent inclinations to do so. *See, e.g.*, *United States v. Torres-Castro*, 470 F.3d 992, 997 (10th Cir. 2006) ("[W]e must conclude that a protective sweep is only valid when performed incident to an arrest – at least until an *en banc* panel of this court determines otherwise."); *United States v. Garza*, 125 F. App'x 927, 931 (10th Cir. 2005) (holding protective sweeps limited to arrests because "we . . . may not overrule a panel of this court absent an *en banc* decision").

After careful review and consideration, the Court finds persuasive the reasoning of the vast majority of the federal courts of appeal and the Supreme Court of New Jersey. Thus, the Court holds that protective sweeps are permissible in non-arrest settings, including where entry is obtained via consent.

The next question is how protective sweeps in non-arrest settings should be evaluated. Any protection in such circumstances cannot extend blanketly whenever law enforcement is lawfully inside a home. Such a broad permit would encourage the pretextual use of otherwise lawful police presence to facilitate warrantless searches and thereby risk "swallow[ing] whole the protections of the warrant requirement." *See Davila*, 203 N.J. at 121; *United States v. Gandia*, 424 F.3d 255, 262-64 (2d Cir. 2005); *Gould*, 364 F.3d at 589. Such risks are heightened when access to the home

is secured by consent and even more so when such consent is "expressly or implicitly" limited in some fashion or the purpose for the entry could have been accomplished by other means. *See Gandia*, 424 F.3d at 263; *Gould*, 364 F.3d at 589.

Seeking to account for these competing considerations, the Fifth Circuit, sitting *en banc*, reformulated *Buie* into a four-step test. It held that a protective sweep of a home is permissible when: (a) law enforcement was lawfully on the premises for a legitimate purpose and did not enter or remain illegally; (b) law enforcement on the scene had a reasonable articulable suspicion that the area to be swept harbored an individual posing a danger; (c) the sweep was limited to cursory inspection of those spaces where a person may be found; and (d) the sweep was limited temporally to last no longer than necessary. *Gould*, 364 F.3d at 587; *see also Davila*, 203 N.J. at 125. The Court considers this test sufficient to determine the extent of permissible protective sweeps under *Buie* and therefore applies it here.

a.      *Lawful Presence, Legitimate Purpose*

The Agents were present in Ms. Burgos' apartment for a legitimate purpose – interviewing her as part of an investigation into the DTO based on her apparent connections to members of that organization and its narcotics distribution. Additionally, there is no indication that the Agents had an ulterior motive to search her apartment. As two Agents testified, they did not expect to find anyone other than Ms. Burgos inside her apartment and sent a similar number of Agents to conduct a knock and talk at another location that same morning. Additionally, it is undisputed that Ms. Burgos consented to their entry into her home and there is no indication she ever rescinded that permission. Thus, the Agents lawfully entered Ms. Burgos apartment for a legitimate purpose and did not remain illegally. *See, e.g.*, *United States v. Murray*, 821 F.3d 386, 391 (3d Cir. 2016) ("[C]onsent is an exception to the requirements of both a warrant and probable cause." (internal citations and modifications omitted)).

b.      *Reasonable Articulable Suspicion*

The second element has two facets – the Agents must have been in possession of specific and articulable facts that reasonably indicated both that an individual was present, and that said individual posed a danger to the Agents or others.  Here, the first aspect is clearly met – Ms. Burgos told the Agents that an individual was present in her home.  The second, however, is not.

The Government asserts that the Agents were in possession of the following information justifying the sweep: Ms. Burgos and the apartment were "connected to a [DTO] responsible for a heroin overdose death"; "two of the three targets of the investigation had been arrested . . . that day in possession of narcotics"; "a third target was still at large"; "drug trafficking is inherently dangerous, often involving firearms and the potential for violence"; another individual was inside the apartment and Ms. Burgos "had not given any detail as to who the person was or their relationship to her"; and "the unidentified [person] had not responded to several loud announcements that police were in the apartment."  (D.I 27 at 13-14).

These facts raise the specter that Ms. Burgos' apartment may have harbored a danger, but do not constitute "specific and articulable facts" reasonably indicating that Defendant posed a danger to the Agents or others.  The third DTO member was never "pinged" at Ms. Burgos' apartment and there is no indication that he or anyone else connected to the DTO was suspected of being there at the time the Agents arrived.  Moreover, being cognizant of a lack of information is not the same as possessing information.  That the Agents did not know anything about the other person in the apartment and did not know where the third target of the investigation was located are not "articulable facts"; they are the absence of fact.  Ms. Burgos gave no indication, such as a head nod, pause, or silence, that the other person in her home was dangerous – she answered the Agent's question directly and completely.  *See United States v. Crisolis-Gonzalez*, 742 F.3d 830, 836 (8th Cir. 2014) (allowing protective sweep based in part on fact that other occupants did not

respond when asked if another person was inside apartment and one paused before slightly turning his head towards a hallway).  Although she did not offer any details regarding the person's identity, the Agents did not ask for any, either in their initial question or subsequently.  Additionally, there are many reasons a person may not respond to a police announcement, one of which is that he or she is asleep.  Based on the timing of the Agents' entry – approximately 7:30 a.m. – the fact that Defendant did not respond to the Agents' announcements did not reasonably indicate that he harbored a danger to the Agents or others.

Moreover, the DEA possessed almost all of the information they cite as justifying the sweep before they entered Ms. Burgos' apartment – the only exception being that Defendant did not respond to their announcements.  Though the government argues that "many Courts of Appeal have upheld protective sweeps even where police entered a home knowing facts that led to a belief that a protective sweep would be necessary," (D.I. 27 at 15-16), in all but one of the cases it cites, law enforcement discovered key information justifying the sweep after they entered the home, and in the last case, law enforcement already had probable cause to arrest the individual they believed to be in the home prior to entering or sweeping his apartment.  *See United States v. Ortega-Montalvo*, 850 F.3d 429, 432, 434-35 (8th Cir. 2017) (law enforcement discovered unknown person was inside home after entry); *United States v. Thompson*, 842 F.3d 1002, 1008-09 (7th Cir. 2016) (noting, in analysis of permissibility of sweep, that law enforcement had probable cause to arrest defendant prior to entering and sweeping home); *United States v. Moten*, 617 F. App'x 186, 194 (3d Cir. 2015) (law enforcement saw man matching description of wanted gunman in plain view after entry); *Gould*, 364 F. 3d at 587-93 (law enforcement discovered man supposedly in home was not where roommate said he was after they entered); *United States v. Taylor*, 248 F.3d 506, 512-14 (6th Cir. 2001) (law enforcement saw drugs in plain view after entry).  As already

noted, in the context of their early-morning entry, Defendant's failure to respond to the Agents' announcements did not indicate that he harbored a danger.

Additionally, the Agents were not compelled – by purpose or probable cause – to enter the apartment. The conversation could have occurred elsewhere, even if inconvenient. The Government counters that the Agents had no duty to avoid danger, citing two cases from outside our circuit in support. (D.I. 27 at 17). Both cases, however, considered the inverse issue – whether law enforcement officers should have abandoned a situation that they reasonably believed presented a danger, not whether they should have entered into a situation for which they held a similar belief. *See United States v. Vance*, 53 F.3d 220, 222 n.4 (8th Cir. 1995) (considering whether law enforcement was obligated to leave area they believed contained a danger); *United States v. House*, 463 F. App'x 783, 793 (10th Cir. 2012) (considering whether law enforcement is obligated to end consensual encounters with individuals they believe to be dangerous). Moreover, the portion of the second case the Government cites is from the dissent. *See House*, 463 F. App'x at 786-87. The majority in that case "assume[d] (without deciding)" the same issue. Thus, both cases are inapplicable.

In sum, before they entered the apartment, the Agents knew the significant facts that purportedly justified the protective sweep, and also knew that they could have interviewed Ms. Burgos elsewhere. In such circumstances – where law enforcement is so fully versed on the risks of entering a home in advance and their entry is based on consent – it is imperative that at least some substantive facts justifying the sweep develop after law enforcement enters. To find otherwise would chart dangerously close to endorsing law enforcement's pretextual use of consent

entries to conduct searches otherwise prohibited by the Fourth Amendment. The Court declines to do so.[6]

        *c.*     *Search Limited to "Cursory" Inspection of Places Where Person May Be Found*

The Agents' actions satisfy the third element. They only examined those spaces where a person could have been hiding – they did not, for example, open drawers or cabinets – and the sweep lasted no more than two minutes and twenty seconds.

        *d.*     *Search No Longer Than Necessary*

The Agents' actions also satisfy the fourth element for many of the same reasons that they satisfy the third. The initial protective sweep lasted no more than two minutes and twenty seconds and ended shortly after Defendant was detained. To the extent that it continued after Defendant was discovered, it was circumspect (lasting no more than twenty seconds and again limited to those places where a person could hide) and was a justified extension based on the fact that they were detaining Defendant and by the sweeping Agent's experience that "[w]here there is one individual, there [are typically] two." (*See* Tr. at 69:25 – 70:10).

Because the Agents lacked reasonable articulable suspicion justifying the search before initiating the protective sweep, however, their "protective sweep" of Defendant's bedroom violated his rights under the Fourth Amendment.

---

[6]    The Government also argues that "nothing required the officers to ask follow up questions once they develop[ed] reasonable suspicion" and "if multiple different avenues are legal, reasonableness under the Fourth Amendment does not require choosing the least intrusive means." (D.I. 27 at 17-18). Although both of these arguments may be true, neither is applicable here – the question is whether the Agents developed the necessary suspicion before initiating the protective sweep or asking follow-up questions, not after.

2.     Good Faith Exception

Although violation of an individual's Fourth Amendment rights can justify exclusion of evidence obtained as a result of that violation, "[w]hether to suppress evidence under the exclusionary rule is a separate question." *United States v. Katzin*, 769 F.3d 163, 170 (3d Cir. 2014) (citing *Hudson v. Michigan*, 547 U.S. 586, 591-92 (2006)).  There is, in fact, "no constitutional right to have the evidentiary fruits of an illegal search or seizure suppressed at trial." *Id.* (citing *Davis v. United States*, 564 U.S. 229, 236 (2011)).  "Simply because a Fourth Amendment violation occurs does not mean that exclusion necessarily follows." *Id.* (citing *Herring v. United States*, 555 U.S. 135, 140 (2009)).  Rather, exclusion must be, and has always been, "our last resort, not our first impulse." *Herring*, 555 U.S. at 140 (quoting *Hudson*, 547 U.S. at 591).

To determine whether application of the exclusionary rule is appropriate, the Court must weigh the "deterrent value" of exclusion, *i.e.* the ability of exclusion to "compel respect for the [Fourth Amendment's] constitutional guarantee," *Elkins v. United States*, 364 U.S. 206, 217 (1960), against the "social costs," such as that associated with omitting "reliable, trustworthy evidence" of a person's guilt, thereby "suppressing the truth and setting a criminal loose in the community without punishment," *Katzin*, 769 F.3d at 171 (citing *Davis v. United States*, 564 U.S. at 237). *See also id.* at 170-71.  The good faith exception helps maintain this balance.  It instructs that: "[w]here the particular facts of a case indicate that law enforcement officers 'acted with an objectively "reasonable good-faith belief" that their conduct was lawful, or when their conduct involved only simple, "isolated, negligence,"' there is no illicit conduct to deter." *Id.* at 171 (quoting *Davis v. United States*, 564 U.S. at 237-38) (internal modifications omitted).  In other words:

> exclusion is appropriate only where law enforcement conduct is both "sufficiently deliberate" that deterrence is effective and "sufficiently culpable" that deterrence

outweighs the costs of suppression. *Herring*, 555 U.S. at 144 . . . . Thus, determining whether the good faith exception applies requires courts to answer the "objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal in light of all of the circumstances." *Id.* at 145, 129 S.Ct. 695 (quoting [*United States v.*] *Leon*, 468 U.S. [897,] 922 n.23 [(1984)], 104 S.Ct. 3405) (internal quotation marks omitted)).

*Katzin*, 769 F.3d at 171. Moreover, the inquiry "must focus on the 'flagrancy of the police misconduct' at issue." *Id.* at 178 (quoting *Davis v. United States*, 564 U.S. at 237).

The Government argues that the Agents "acted in good-faith at all times," "sought to interview [Ms. Burgos] indoors in the interests of privacy and safety," and "only sought to find and identify Defendant after learning . . . that another individual was inside" Ms. Burgos' apartment. (D.I. 14 at 12); (D.I. 27 at 19). The Agents did so, allegedly, "under the reasonable belief that this unidentified individual could pose a safety risk." (D.I. 14 at 12); (D.I. 27 at 19). Defendant has countered that "the Agents were aware that their conduct was unconstitutional under the Fourth Amendment" because they "knew nothing about Ms. Burgos' tenant before they arrived[] that would justify a reasonable person to believe that he posed a threat to the Agents" and "[t]here was no evidence that Ms. Burgos or the Def[e]ndant were armed, violent, or dangerous" or that "arms were stored in the apartment." (D.I. 19 at 23-24).

After careful consideration, the Court agrees with the Government. Although the Agents' conduct violated Defendant's Fourth Amendment rights, their actions cannot be characterized as "flagrant" misconduct – they acted with an objectively reasonable good-faith belief that their actions were lawful.

First, as discussed *supra* the law regarding protective sweeps is not settled, especially in the Third Circuit. The Court cannot expect an objectively reasonable law enforcement officer to know that conducting a protective sweep in these circumstances violated Defendants' Fourth Amendment rights.

17

Second, the Agents discovered a key piece of information – the presence of an unknown individual inside Ms. Burgos' apartment – when the lead agents were on the threshold. Although they were technically outside, the Agents had little time to process the import of this information. Moreover, the Agents had general reasons to be concerned for their safety: they were meeting with an individual with some connection to drug trafficking, a criminal activity frequently associated with violence, *see, e.g.*, *Thompson*, 842 F.3d at 1009 (noting "guns are known tools of the drug trade and interactions with those suspected of drug trafficking present an inherent danger to law enforcement"), had just discovered an unexpected, unknown person was inside the area they were entering, knew that one of the DTO members had not yet been found, and knew, because they were the third act of a larger operation, that news of their interdiction efforts may have already reached other parties connected to or part of the DTO and could cause such parties to react violently, (*see* Tr. at 7:12 – 8:12; 16:3-9).

Although, in hindsight, the Agents lacked sufficiently reasonable particularized justification to believe that the unidentified person inside Ms. Burgos' apartment posed a danger to themselves or others, they had reason to be concerned for their safety. *See United States v. Garcia*, Nos. 10-cr-00301-BLF-4, 15-cr-00288-BLF-1, 2019 WL 827635 (Feb. 21, 2019 N.D. Cal.) (holding the court could not "find the officers acted with an objectively reasonable good-faith belief that [their] warrantless entry was lawful" because the "Ninth Circuit determined that the police had no reason to believe that anybody remained inside the residence – much less somebody violent or injured . . . and that there were no facts supporting a reasonable belief that there were individuals inside the house who threatened the officers' safety" (internal citations, modifications, and quotation marks omitted)).

In such circumstances, the Agents' decision to sweep the apartment may have been negligent, but it was also reactionary, not deliberate or reckless. *See Davis v. United States*, 564 U.S. at 238 ("When the police exhibit 'deliberate,' 'reckless,' or 'grossly negligent' disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs." (citing *Herring*, 555 U.S. at 144)). Thus, the Court finds that the Agents acted with an "objectively reasonable good-faith belief" that their actions were lawful when they conducted the protective sweep.

Based on the foregoing and because the contraband was spotted in plain view during the protective sweep, it cannot be suppressed based on the illegality of that sweep. *See United States v. Yamba*, 506 F.3d 251, 256-57 (3d Cir. 2007) ("As the Supreme Court has said, precedent has 'come to reflect the rule that if, while lawfully engaged in an activity in a particular place, police officers perceive a suspicious object, they may seize it immediately.'" (internal citations omitted)).

**B.      Defendant's Inculpatory Statements Were Neither "Fruit" Nor Involuntary.**

Defendant argues that his inculpatory statements while detained should be suppressed "as the fruits of the illegal search and the ensuing illegal arrest" because they were made "shortly after he was surprised, while asleep, by the [Agents] in his bedroom" and are "the direct result of the illegal search, the ensuing illegal arrest, and the pressured environment in the interrogation room." (D.I. 13 at 6). As noted *supra*, this argument blends two questions: (1) whether Defendant's inculpatory statements were impermissible "fruit" of the protective sweep (indicated by the introductory clause and the "direct result" language (*id.*)) and (2) whether those statements were involuntary (indicated by "this was shortly after he was surprised, asleep" and "pressured environment" language (*id.*)).

1.      Defendant's Inculpatory Statements are Not Suppressible "Fruit" of the Protective Sweep.

Defendant first contends that the inculpatory statements he made following the sweep of his bedroom should be suppressed as "fruits of the illegal search and the ensuing illegal arrest." (*Id.*).   Although verbal evidence, like its more tangible counterparts, may be "fruit" of an unwarranted intrusion in certain circumstances and suppressed in accordance with the exclusionary rule, *see, e.g.*, *Taylor v. Alabama*, 457 U.S. 687 (1982); *United States v. Rivera-Padilla*, 365 F. App'x 343, 346-47 (3d Cir. 2010), the Court need not determine whether Defendant's statements are suppressible "fruit."   Even if they are, Defendant's statements and the contraband discovered in his bedroom would be "fruit" of the same "tree," *i.e.* the protective sweep.   Therefore, the good faith exception applies to Defendant's inculpatory statements for the same reason it applies to the contraband.   *See, e.g.*, *United States v. Wade*, 956 F. Supp. 2d 638, 653 n. 9 (W.D. Pa. July 9, 2013) (discussing application of good faith exception to inculpatory statements purportedly derived from an illegal stop).   Thus, Defendant's inculpatory statements cannot be suppressed as "fruit" of the protective sweep and subsequent detainment.

2.      Defendant's Inculpatory Statements Were Voluntary.

Second, Defendant argues that his inculpatory statements were involuntary as a result of the "pressured" environment of the interrogation room and the fact that he had been asleep when the Agents first encountered him in his bedroom.   (D.I. 13 at 6).   The Government has responded that Defendant properly waived his rights under *Miranda* and, therefore, the inculpatory statements may be introduced against him at trial.   (D.I. 14 at 14).   The Court finds that the Government has met its burden to demonstrate that Defendant waived his rights before making the inculpatory statements at issue and that those subsequent statements were also voluntary.

*Miranda v. Arizona*, 384 U.S. 436 (1966), and its progeny require that law enforcement warn an individual of his or her right to be free from compelled self-incrimination while subject to custodial interrogation. *E.g.*, *United States v. Duncan*, 308 F. App'x 601, 608 (3d Cir. 2009) (citing *Miranda*, 384 U.S. at 479). In such situations, the individual must be

> warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

*Id.* (quoting *Miranda*, 384 U.S. at 479).[7]

Any waiver of those rights must be voluntary, knowing, and intelligent. *Berghuis v. Thompkins*, 560 U.S 370, 382-83 (2010) (citing *North Carolina v. Butler*, 441 U.S. 369, 373 (1979)); *United States v. Whiteford*, 676 F.3d 348, 362 (3d Cir. 2012). In other words, it must be "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it," and must be "the product of a free and deliberate choice rather than the result of intimidation, coercion, or deception." *Berghuis*, 560 U.S at 382-83 (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)). Without such a waiver, law enforcement "may not 'question a suspect without counsel being present [nor] introduce at trial any statements made during the interrogation.'" *Duncan*, 308 F. App'x at 608 (quoting *Alston v. Redman*, 34 F.3d 1237, 1242 (3d Cir. 1994)). It is the Government's burden to establish such a waiver by a preponderance of the evidence. *Berghuis*, 560 U.S. at 384 (citing *Colorado v. Connelly*, 479 U.S. 157, 168 (1986)). "Only if the totality of the circumstances surrounding the interrogation reveal both an

---

[7]     *Miranda* applies when the individual is both in custody and subject to interrogation; however, neither party disputes that Defendant's inculpatory statements were made during a custodial interrogation. The Court agrees – he was handcuffed, transported to the DEA's offices, and questioned. *See California v. Beheler*, 463 U.S. 1121, 1125 (1983) (holding Fifth Amendment custody is "restraint on freedom of movement of the degree associated with a formal arrest" (internal citations and quotation marks omitted)).

uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." *Fahy v. Horn*, 516 F.3d 169, 194 (3d Cir. 2008) (quoting *Moran*, 475 U.S. at 421).

After review of the interview video recording and transcript, the Court finds that Defendant knowingly, intelligently, and voluntarily waived his *Miranda* rights. The ultimate question is whether, under the totality of the circumstances, the Agents "were so manipulative or coercive that they deprived [Defendant] of his ability to make an unconstrained, autonomous decision to confess." *United States v. Griggie*, 105 F. App'x. 431, 435 (3d Cir. 2004) (quoting *Miller v. Fenton*, 796 F.2d 598, 605 (3d Cir. 1986)). Relevant factors include Defendant's age and education; the length of detention; the nature and circumstances of the questioning, including duration as well as repetition; Defendant's familiarity with the criminal justice system; whether Defendant was apprised of his constitutional rights; whether he was subjected to physical punishment; and whether he possessed low intelligence or was otherwise unable to comprehend his rights. *See, e.g.*, *United State v. Bradley*, 370 F. Supp. 3d 458, 475 (M.D. Pa. Apr. 2, 2019) (citing *Oregon v. Bradshaw*, 462 U.S. 1039, 1046 (1983); *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973); *United States v. Velasquez*, 885 F.2d 1076, 1086 (3d Cir. 1989); *Miller*, 796 F.2d at 604)).

Here, the Agents provided Defendant his *Miranda* rights in his native language both orally and in writing. They then asked him – twice – whether he understood those rights, both times in Spanish and both times orally and in writing. Twice, in turn, he nodded before indicating his agreement in writing on the notice form. They then asked him, again twice, whether he was willing to speak to them without a lawyer present. He, again, indicated agreement each time before initialing and signing the notice form to indicate the same. He is a middle-aged adult with assumed

normal intelligence. Although the Agents initially surprised Defendant in his bedroom, the interrogation did not begin until almost an hour later and Defendant appears alert and coherent throughout. Additionally, no evidence has been presented suggesting that Defendant was suffering from any impaired function, either physically or psychologically. Furthermore, he had prior experience with the criminal justice system from his deportation for illegal entry two years prior.

As to the circumstances of the interview, Defendant was interrogated by three Agents (including one functioning as a translator) in a room that comfortably seats at least a dozen and is also used as a meeting room for the DEA task force. None of the Agents was in uniform, nor did the Agents display any weapons. Although the Agents repeated some questions, the entire interview – from the recitation of rights to the concluding small talk, lasted approximately thirty minutes and the Agents were cordial and professional throughout. Finally, at no point did Defendant state or suggest that he wanted the questions to end or that he wanted to speak with his lawyer. (*See* D.I. 22, Exhibits 4-5). In light of the foregoing, the Court finds that Defendant's waiver of his rights and subsequent inculpatory statements were voluntary.

**C.      Defendant's Consent to Search Was Voluntary.**

Finally, the Court must assess whether Defendant's consent to a more thorough search of his bedroom was voluntary. Again, the Government bears the burden to prove that consent was freely and voluntarily given. *United States v. Price*, 558 F.3d 270, 277-78 (3d Cir. 2009) (citing *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968)). The standard to be applied is similar to that used to ascertain whether any other statement is voluntary – it is determined by "examining the totality of the circumstances," including both the "characteristics of the accused" – such as his age, education and intelligence – and "the details of the investigation" – such as "whether the subject was advised of his or her constitutional rights; the length of the encounter; the repetition or duration of the questioning; . . . the use of physical punishment"; "the setting in which the

consent was obtained"; and "the parties' verbal and non-verbal actions." *Id.* at 278 (internal citations omitted).

As noted, Defendant is an adult, apparently of average intelligence, who had previous experience with the criminal justice system and appeared alert throughout the interrogation. The atmosphere surrounding his consent was not hostile and Defendant was not subjected to physical punishment. The three Agents participating in the interview acted professionally and courteously throughout, were dressed in plainclothes without weapons visible, informed Defendant of his rights and confirmed his understanding of them, and conducted the interrogation in an ordinary conference room large enough for at least a dozen people. Although the Agents asked for Defendant's consent to search several times, they did so as part of a conversation in which they were attempting to explain to Defendant that he, as the tenant, was the one with the power to consent to a search of his room. (D.I. 22, Exhibit 4 at 13:08 – 25:08); (D.I. 22, Exhibit 5 at 15-27). Moreover, the discussion regarding whether Defendant would consent lasted less than ten minutes, (D.I. 22, Exhibit 4 at 13:08 – 22:33); (D.I. 22, Exhibit 5 at 15-24), and the entire interview lasted a mere thirty minutes.

Therefore, the Court concludes that Defendant's consent to a full search of his room was voluntary.

## III.    <u>CONCLUSION</u>

Because the good faith exception prevents suppression of any "fruit" of the protective sweep and both Defendant's later inculpatory statements and consent to a more thorough search of his bedroom were voluntary, neither the contraband discovered in his bedroom or his inculpatory statements will be suppressed. Defendant's Motion to Suppress is therefore DENIED.

An appropriate order will be entered.